IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF ILLINOIS

| | |
|---|---|
| **MANDY L. EDMONDS,** ) | |
| ) | |
| Plaintiff, ) | |
| ) | |
| v. ) | Civil No. 11-1134-GPM-CJP |
| ) | |
| **MICHAEL J. ASTRUE,** ) | |
| **Commissioner of Social Security,** ) | |
| ) | |
| Defendant. ) | |

### REPORT and RECOMMENDATION

This Report and Recommendation is respectfully submitted to District Judge G. Patrick Murphy pursuant to **28 U.S.C. § 636(b)(1)(B)**.

In accordance with **42 U.S.C. § 405(g)**, plaintiff Mandy L. Edmonds seeks judicial review of the final agency decision denying her Disability Insurance Benefits (DIB) and Supplemental Security Income (SSI) pursuant to **42 U.S.C. § 423**.[1]

### Procedural History

Ms. Edmonds applied for benefits in 2008, alleging disability beginning on September 26, 2007. (Tr. 107, 110). The application was denied initially and on reconsideration. After a hearing, Administrative Law Judge (ALJ) Jonathon P. Blucher denied the application on May 26, 2010. (Tr. 16-30). Plaintiff's request for review was denied by the Appeals Council, and the

---

[1] The statutes and regulations pertaining to DIB are found at 42 U.S.C. § 1382, et seq., and 20 C.F.R. pt. 404. The statutes and regulations pertaining to SSI are found at 42 U.S.C. §§ 1382 and 1382c, et seq., and 20 C.F.R. pt. 416. For all intents and purposes relevant to this case, the DIB and SSI statutes are identical. Furthermore, 20 C.F.R. § 416.925 detailing medical considerations relevant to an SSI claim, relies on 20 C.F.R. Pt. 404, Subpt. P, the DIB regulations. Most citations herein are to the DIB regulations out of convenience.

May 26, 2010, decision became the final agency decision. (Tr. 1).

Plaintiff has exhausted her administrative remedies and has filed a timely complaint in this court.

## Issue Raised by Plaintiff

Plaintiff makes the following arguments:

(1)  The ALJ erred in failing to explain why he rejected part of the opinion of state agency consultant Dr. Tin regarding her mental impairments.

(2)  The ALJ improperly rejected the opinion of her treating psychiatrist, Dr. Grater.

## Applicable Standards

To qualify for DIB or SSI, a claimant must be disabled within the meaning of the applicable statutes. For these purposes, "disabled" means the "inability to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less than 12 months." **42 U.S.C. §§ 423(d)(1)(A) and 1382c(a)(3)(A).** A "physical or mental impairment" is an impairment resulting from anatomical, physiological, or psychological abnormalities which are demonstrable by medically acceptable clinical and laboratory diagnostic techniques. **42 U.S.C. §§ 423(d)(3) and 1382c(a)(3)(C).** However, limitations arising from alcoholism or drug use are excluded from consideration of whether a claimant is disabled. **42 U.S.C. §423(d)(2)(C); 20 C.F.R. §404.1535.**

Social Security regulations set forth a sequential five-step inquiry to determine whether a claimant is disabled. The Seventh Circuit Court of Appeals has explained this process as follows:

> The first step considers whether the applicant is engaging in substantial gainful activity. The second step evaluates whether an alleged physical or mental impairment is severe, medically determinable, and meets a durational requirement. The third step compares the impairment to a list of impairments that are considered conclusively disabling. If the impairment meets or equals one of the listed impairments, then the applicant is considered disabled; if the impairment does not meet or equal a listed impairment, then the evaluation continues. The fourth step assesses an applicant's residual functional capacity (RFC) and ability to engage in past relevant work. If an applicant can engage in past relevant work, he is not disabled. The fifth step assesses the applicant's RFC, as well as his age, education, and work experience to determine whether the applicant can engage in other work. If the applicant can engage in other work, he is not disabled.

***Weatherbee v. Astrue*, 649 F.3d 565, 568-569 (7th Cir. 2011).**

Stated another way, it must be determined (1) whether the claimant is presently unemployed; (2) whether the claimant has an impairment or combination of impairments that is severe; (3) whether the impairments meet or equal one of the listed impairments acknowledged to be conclusively disabling; (4) whether the claimant can perform past relevant work; and (5) whether the claimant is capable of performing any work within the economy, given his or her age, education and work experience.  **See, *Schroeter v. Sullivan*, 977 F.2d 391, 393 (7th Cir. 1992); *Pope v. Shalala*, 998 F.2d 473, 477 (7th Cir. 1993); 20 C.F.R. § 404.1520(b-f).** If the answer at steps one and two is "yes," the claimant will automatically be found disabled if he or she suffers from a listed impairment, determined at step three.  If the claimant has a severe impairment but does not meet or equal a listed impairment at step three, and cannot perform his or her past work (step four), the burden shifts to the Commissioner at step five to show that the claimant can perform some other job.  ***Rhoderick v. Heckler*, 737 F.2d 714, 715 (7th Cir. 1984).** The Commissioner bears the burden of showing that there are a significant number of jobs in the economy that claimant is capable of performing.  **See, *Bowen v. Yuckert*, 482 U.S. 137, 146, 107**

S. Ct. 2287, 2294 (1987); *Knight v. Chater*, 55 F.3d 309, 313 (7th Cir. 1995).

It is important to keep in mind the proper standard of review for this Court.  "The findings of the Commissioner of Social Security as to any fact, if supported by substantial evidence, shall be conclusive. . . ."  **42 U.S.C. § 405(g).**   Thus, the question for the Court is not whether Ms. Edmonds was, in fact, disabled during the relevant time period, but whether the ALJ's findings were supported by substantial evidence; and, of course, whether any errors of law were made. **See,** *Books v. Chater*, 91 F.3d 972, 977-978 (7th Cir. 1996) (citing *Diaz v. Chater*, 55 F.3d 300, 306 (7th Cir.1995)).

This Court uses the Supreme Court's definition of "substantial evidence," that is, "such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." ***Richardson v. Perales*, 402 U.S. 389, 401, 91 S.Ct. 1420, 1427 (1971).**  In reviewing for substantial evidence, the entire administrative record is taken into consideration, but this Court does <u>not</u> reweigh evidence, resolve conflicts, decide questions of credibility, or substitute its own judgment for that of the ALJ.  ***Brewer v. Chater*, 103 F.3d 1384, 1390 (7th Cir. 1997)**.  However, while judicial review is deferential, it is not abject; this Court does not act as a rubber stamp for the Commissioner.  See, ***Parker v. Astrue*, 597 F.3d 920, 921 (7th Cir. 2010), and cases cited therein.**

<h3 style="text-align:center"><u>The Decision of the ALJ</u></h3>

ALJ Blucher followed the five-step analytical framework described above.  He concluded that plaintiff had not engaged in substantial gainful activity since the alleged onset date, and that she was insured for DIB through December 31, 2011.  He determined that plaintiff had severe impairments of kidney disease, obesity, degenerative disc disease in the spine, seizure disorder,

fibromyalgia, chronic pain syndrome, major depressive disorder and anxiety disorder. He found that Ms. Edmonds' impairments did not meet or equal a listed impairment, which plaintiff does not dispute.

The ALJ concluded that plaintiff had the residual functional capacity (RFC) to perform a limited range of work at the light and sedentary exertional levels. He accommodated her mental limitations by restricting her to simple work, finding that she had mildly below average concentration, persistence or pace, stipulating that she cannot do high stress work and limiting her to work involving little contact with others. Relying on the testimony of a vocational expert, the ALJ concluded that Ms. Edmonds was able to perform her past relevant work as a housekeeper, and she was also able to do other jobs such as grater/sorter, library assistant, assembler, hand packer and packager, which exist in significant numbers in the regional and national economies.

### The Evidentiary Record

This Court has reviewed and considered the entire record in formulating this Report and Recommendation. The following is a summary of some of the pertinent portions of the written record, focused on the issues raised by plaintiff. As plaintiff has not raised an issue with respect to her physical condition, the Court will not summarize that evidence.

**1.      Agency Forms**

Ms. Edmonds was born in 1975, and was 32 years old when she allegedly became disabled in 2007. (Tr. 124). She obtained a GED in 1993. (Tr. 136).

Plaintiff stated that she stopped working on January 31, 2007, because she was laid off and then got sick. (Tr. 128). She had worked at a number of jobs, including cook, cashier, deli

worker, house cleaner and seamstress in a factory. (Tr. 129-130, 138-139).

In response to a question on a form, Ms. Edmonds stated that she has increased anxiety in public, and she gets very nervous and angry when she has to go to a store. She has PTSD, and certain sounds trigger withdrawal or increased agitation. She had been depressed since she became ill. She has trouble coping with her pain and anxiety. (Tr. 190). On another form, she said that she had trouble concentrating and had some days when she was so nervous that she had panic attacks. (Tr. 199).

**2.      Evidentiary Hearing April 16, 2010**

Plaintiff was represented at the hearing by an attorney. (Tr. 37).

She was living with her mother and her 17 year old daughter at the time of the hearing. (Tr. 15-16). She was 5'2" tall and weighed 187 pounds. (Tr. 40). She had a drivers license but no car. Her mother drove her places. She went to the store, church and doctors' appointments. (Tr. 41).

Plaintiff testified that she did not drink alcohol. (Tr. 41).

Ms. Edmonds said she could not work because she had major mood swings and things that people say "may set me off." She had been that way since having a "nervous breakdown" four years earlier. (Tr. 42). She said that she could not keep her mind on anything. She laid around a lot because she did not feel good. She did not feel good because "life sucks." (Tr. 44). She did not get medical attention for her nervous breakdown. She explained that she was "hard headed" and did not like doctors or hospitals because she felt no one cared. (Tr. 50-51).

Plaintiff testified that she had a car accident on March 12, 2010. She was driving and her car hydroplaned into a 70 foot ravine. She said the police found her and took her to Herrin

Hospital. The ALJ asked to see the police report, but plaintiff told him that the police did not write one. (Tr. 52-53).

A vocational expert also testified. The ALJ asked the VE to assume a person who was limited to work at the sedentary to light exertional level, further limited to only occasional postural activities (e.g., climbing, stooping, kneeling), no exposure to heights or hazards, no climbing of ladders, ropes or scaffolds, and limited to simple jobs, mildly below average concentration, persistence and pace, no high stress work and with little contact with others. The VE testified that this person could do plaintiff's past relevant work as a house cleaner. She could also do other jobs which exist in significant numbers in the regional and national economies. (Tr. 55-57).

**3.    Medical Records**

The earliest records of psychiatric treatment are from September, 2008. Ms. Edmonds was admitted to a "partial hospitalization" program at St. Mary's Good Samaritan on September 19, 2008, due to an increase in her depressive symptoms. She came under the care of Dr. Grater there. At the initial interview, she indicated that she had pain issues due to chronic health problems, and her orthopedic doctor would not prescribe medication for her depression. She had a history of abuse by her parents and a boyfriend. She was separated from her husband. She scored at the low end of the severe range (51) on the Burns Depression Checklist, and in the middle of the moderate range (31) on the Burns Anxiety Inventory. The initial impression was bipolar II and panic disorder. (Tr. 302-309). She was discharged from the program in November, 2008, after having attended 63 group sessions. Her attendance was described as "sporadic." Her Burns Depression and Anxiety scores did not improve. Her GAF at discharge

was 62. Although she was discharged from that program, she continued to be seen at St. Mary's. The discharge note was written on December 1, 2008. (Tr. 289-299). The recommendations were to take her medications as prescribed, attend all psychiatric appointments and to attend therapy sessions. The diagnoses were major depressive disorder, panic disorder and possible bipolar disease. (Tr. 299).

In November, 2008, while plaintiff was in the program at St. Mary's Good Samaritan, Dr. Grater completed a report for the State of Illinois Department of Human Services. He indicated that he had first seen plaintiff on September 19, 2008. He had seen her five time a week at first, and was seeing her three times a week when the report was written. He diagnosed major depressive disorder, panic disorder and posttraumatic stress disorder. He described her as very depressed, anxious and having panic attacks. He indicated that she had marked limitation in activities of daily living, marked to extreme limitation in social functioning and extreme limitation in concentration, persistence and pace. (Tr. 253-257).

The transcript contains records from ten office visits with Dr. Grater from November 25, 2008, through March 8, 2010. (Tr. 360-369, 390-404). On the first visit, her medications were Topamax, Clonazepam, Lyrica, Pristiq and Trazodone. She had been out of Clonazepam, Lyrica and Pristiq for several weeks, and had recently obtained Topamax. On exam, her mood was depressed and her affect was blunted. The assessment was severe recurrent major depression, anxiety disorder NOS and fibromyalgia. She was instructed to "Begin taking her medications as prescribed!" (Tr. 368-369).

On January 5, 2009, Ms. Edmonds told Dr. Grater that her medications were not working. He told her to discontinue Pristiq, start taking Effexor and increase her dosage of Clonazepam.

She was also to resume counseling. (Tr. 366-367). Dr. Grater again increased the dose of Clonazepam on January 31, 2009. (Tr. 364-365).

Psychologist Philip Burke, PhD, performed a consultative psychological exam on February 16, 2009. He observed that Ms. Edmonds displayed poor working memory, difficulties with attention and concentration, poor fund of information, memory problems, uncertainty as to date and time, flattened affect and inappropriate laughter. He opined that, while this was consistent with her self-reported symptoms, it "could also be consistent with relatively high dose of Clonazepam combined with the other medications in her system." His diagnostic impression was major depressive disorder, likely recurrent, currently severe and anxiety disorder of unknown type with PTSD symptoms. He assessed her GAF at 40. (Tr. 320-325).

Ms. Edmonds returned to Dr. Grater on March 10, 2009. She reported that her symptoms were controlled on her current medications. However, she stayed at home and was extremely passive, and her sleep was not good. Dr. Grater noted that her affect was labile, blunted and flat. Her thought processes were not impaired and she had no suicidal ideation. He instructed her to discontinue Trazodone and try Remeron for sleep. (Tr. 362-363). On April 15, 2009, Ms. Edmonds told Dr. Grater she was still anxious. He increased her dosage of Clonazepam. (Tr. 360-361). In June, 2009, Ms. Edmonds told Dr. Grater that she had been raped and her home was burglarized, but the police said she could not file charges because she let the perpetrators into her house. She reported that her anxiety medications were not working. He added Abilify to her other medications. (Tr. 401-402).

In August, 2009, Dr. Grater noted that Ms. Edmonds seemed calmer and happier. She told him that Clonazepam had "worn off" and Trazodone was not helping her to sleep anymore.

Her mood was anxious, but not depressed and she was not irritable. He instructed her to discontinue Clonazepam and to try Aplrazolam. (Tr. 398-399). On September 3, 2009, she reported that she was feeling nervous and shaky, and could not sleep. Dr. Grater discussed her behavior towards his office staff, and he told her that, if she abused his staff again, she would have to find another doctor. On exam, she was tense, shaky and crying with a depressed anxious and irritable mood. Her thought processes were impaired. His assessment was moderate recurrent major depression and anxiety disorder NOS. He added Diazepam and Temazepam to her current medications. (Tr. 396-397).

In November, 2009, plaintiff was still depressed and reported that her anxiety emerged at times. Dr. Grater adjusted her medications. (Tr. 393-395).

The last visit with Dr. Grater was on March 8, 2010. She told him that taking Valium had caused her to gain weight and made her lethargic. She was 5'2" and weighed 180 pounds. She told Dr. Grater that she was not using alcohol or drugs. Her mood was depressed and anxious. She wanted to retry Clonazepam, so he told her to reduce Valium and start Clonazepam. They discussed "the possibility of oversedation." Her Burns Depression Score was 69 and her Burns Anxiety Score was 77. (Tr. 390-392).[2]

Three days later, on March 11, 2010, Ms. Edmonds was taken to the emergency room at Herrin Hospital after a car accident. The police had found her car in a ditch. She said that she was driving and the car hydroplaned. (Tr. 425). The ambulance report said that she had "ETOH on board." (Tr. 437). She "became combative" when a nurse tried to draw blood for a blood

---

[2] On the Burns Depression Checklist and the Burns Anxiety Inventory, a higher score indicates a more severe condition. See, Tr. 307.

alcohol test, and security was called. (Tr. 436). Her blood alcohol count was 80 mg/dL. (Tr. 441).

The transcript contains records from an inpatient psychiatric hospitalization in January, 2011. (Tr. 446-455). This evidence postdates the ALJ's decision, and was submitted to the Appeals Council, which denied review. See, Tr. 5. Because it was not before the ALJ, this evidence cannot be considered by this Court in determining whether the ALJ's decision was supported by substantial evidence. **Getch v. Astrue,** **539 F.3d 473, 484 (7th Cir. 2008);** **Rice v. Barnhart**, **384 F.3d 363, 366, n. 2 (7th Cir. 2004)**.

**4.**     **State Agency Consultants' Assessments**

Howard Tin, PsyD, completed a Psychiatric Review Technique form on March 6, 2009.[3] (Tr. 334-347). This assessment was based on a review of medical records and not a personal examination. Dr. Tin opined that Ms. Edmonds had major depressive disorder recurrent severe, anxiety disorder and PTSD. A section of the form required him to assess functional limitations with reference to the so-called B Criteria, which are the criteria set forth in paragraph B of the mental disorders Listings. See, 20 C.F.R. Subpt. P. App. 1, §§12.00 et seq. Dr. Tin rated her restriction of activities of daily living, difficulties in social functioning and difficulties in maintaining concentration, persistence or pace as "moderate." See, Tr. 344.

Dr. Tin also completed a Mental RFC Assessment form. (Tr. 356-359). He again rated her as moderately limited in a number of areas, including the ability to maintain attention and concentration for extended periods and the ability to perform within a schedule, maintain regular

---

[3] The Psychiatric Review Technique form is part of the "special technique" used by the agency in evaluating alleged mental impairments. The special technique is explained in 20 C.F.R. §404.1520a.

attendance and be punctual.  See. Tr. 356.

## Analysis

Ms. Edmonds argues, correctly, that ALJ Blucher erred in his consideration of the opinions of the state agency consultant, Dr. Tin.

The ALJ mentioned Dr. Tin's reports at Tr. 27, noting that Dr. Tin said that plaintiff was able to carry out short and simple instructions, respond appropriately to changes in the work setting, be aware of hazards, travel in unfamiliar settings and set realistic goals.  However, he failed to note that Dr. Tin opined that plaintiff was *moderately* limited in concentration, persistence or pace in the Psychiatric Review Technique form, and also opined that she was *moderately* limited in ability to maintain attention and concentration for extended periods in the Mental RFC Assessment.  The ALJ said that he "considered" the state agency consultant's opinions, but he did not give any reason for rejecting the moderate limitations assigned by Dr. Tin.  In his RFC findings, the ALJ assessed plaintiff as only "mildly below average [in] concentration, persistence or pace."  See, Tr. 20.

Dr. Tin was acting as a state agency consultant.  "State agency medical and psychological consultants are highly qualified physicians and psychologists who are experts in the evaluation of the medical issues in disability claims under the Act."  SSR 96-6p, at *2.  The ALJ is required by 20 C.F.R. §§ 404.1527(f) and 416.927(f) to consider the state agency consultant's findings of fact about the nature and severity of the claimant's impairment as opinions of non-examining physicians; while the ALJ is not bound by the opinion, he may not ignore it either, but must consider it and explain the weight given to the opinion in his decision.  **See, *McKinzey v. Astrue*, 641 F.3d 884, 891(7th Cir. 2011).**  Here, ALJ Blucher failed to explain the weight he gave to Dr.

Tin's opinion.

The Commissioner does not dispute the proposition that an ALJ is required to explain the weight given to a state agency consultant's opinion. He argues that the ALJ sufficiently accommodated her mental limitation in his RFC assessment, but he does not argue that the ALJ explained why he rejected Dr. Tin's opinion that Ms. Edmonds had moderate, not mild, limitations in maintaining concentration, persistence or pace.

The Commissioner argues that the ALJ sufficiently accounted for Ms. Edmonds' mental impairments by limiting her to simple tasks, noting that Dr. Tin said in his narrative remarks that she was "capable of performing simple tasks." See, Tr. 358. However, this argument misses the mark. The ALJ explicitly found that Ms. Edmonds had "mildly below average concentration, persistence, or pace." (Tr. 20). He erred in failing to explain why he rejected Dr. Tin's opinion that she had moderate, not mild, limitations in this area. Further, the Commissioner's argument runs afoul of the Seventh Circuit's holding that a limitation to simple, repetitive work does not adequately account for a claimant's moderate limitation in maintaining concentration, persistence or pace. ***O'Connor-Spinner v. Astrue,*** **627 F.3d 614, 620 (7th Cir. 2010), and cases discussed therein.**

The ALJ also erred in his consideration of Dr. Grater's opinion. The ALJ recognized that, if Dr. Grater's opinion were accurate, it would mean that Ms. Edmonds was disabled. The ALJ rejected Dr. Grater's opinion, giving it "no significant weight." See, Tr. 25.

As Dr. Grater was a treating doctor, ALJ Blucher was required to evaluate his opinion and determine what weight to give it considering the factors set forth in 20 C.F.R. §404.1527(d). An ALJ must give "good reasons" for discounting a treating doctor's medical opinion; if the

opinion does not merit controlling weight, the ALJ must consider the "checklist of factors" set forth in §404.1527(d). ***Campbell v. Astrue*, 627 F.3d 299, 308 (7th Cir. 2010)**, citing ***Larson v. Astrue*, 615 F.3d 744, 751 (7th Cir. 2010).**

Here, the ALJ did not give good reasons for rejecting Dr. Grater's opinion, and he did not discuss the checklist of regulatory factors. In large part, the reasons the ALJ gave were grounded not in the evidence, but in his own "medical conclusions." An ALJ must resist the temptation to "play doctor." He must base his decision on the medical evidence, and he errs when he reaches his own "independent medical conclusion." ***Myles v. Astrue*, 582 F.3d 672, 677-678 (7th Cir. 2009).** The Seventh Circuit has cautioned that "Common sense can mislead; lay intuitions about medical phenomena are often wrong." ***Schmidt v. Sullivan*, 914 F.2d 117, 118 (7th Cir. 1990).**

Based on his suspicion that plaintiff had not been honest with Dr. Grater about her abuse of alcohol, the ALJ concluded that "Alcohol abuse would serve as a possible explanation for the relative lack of response to treatment noted in Dr. Grater's records . . . ." (Tr. 27). This is problematic for two reasons. First, the ALJ simply assumed that alcohol abuse could, in fact, account for plaintiff's failure to respond to treatment; there is no medical evidence in the record to support that conclusion. Secondly, there is no evidence in the record to support the ALJ's apparent conclusion that Ms. Edmonds abused alcohol throughout the period in which she was treated by Dr. Grater. The ALJ cited to only two places in the record where alcohol abuse was mentioned: upon her admission to St. Mary's Good Samaritan in September, 2008, and at the time of her car accident in March, 2010. The car accident in March, 2010, was after the date of the last visit with Dr. Grater.

Secondly, the ALJ suggested that plaintiff's lack of response to treatment was due to her failure to take her medication as prescribed.  He correctly pointed out that, early in Dr. Grater's treatment, he noted that she had been out of medication for several weeks.  That took place in November, 2008.  (Tr. 368-369).  The only other instance cited by the ALJ was that the "September 9, 2009, treatment notes show her condition worsened after she had gone without medication for some time."  (Tr. 27). This is a misstatement of the record.  In fact, Dr. Grater's note states that plaintiff had not had Buspar for four days.  (Tr. 396).  (Buspar is used to treat anxiety disorders.  See, http://www.ncbi.nlm.nih.gov/pubmedhealth/PMH0000876/, accessed on October 3, 2012.)  Dr. Grater's note does not indicate that plaintiff had gone off her other medications, and does not identify the failure to take Buspar for four days as the cause of her worsening condition.

The ALJ also indulged his own medical conclusions to discount evidence which tended to bolster Dr. Grater's opinion.  One of the factors to be considered in weighing medical opinions is whether the treating doctor's opinion is consistent with other evidence.  See, 404.1577(d)(4).  Here, Dr. Grater's opinion was consistent with the opinion of Dr. Burke, who performed a consultative examination in February, 2009.  (Tr. 26).  Dr. Burke observed that Ms. Edmonds displayed difficulties with attention and concentration, memory problems, flattened affect and inappropriate laughter, among other symptoms, and assigned a GAF of 40.  He stated that, while the results of his examination were consistent with her self-reported symptoms, they "could also be consistent with relatively high dose of Clonazepam combined with the other medications in her system."  (Tr. 320-325).   Seizing upon this remark, the ALJ concluded that Ms. Edmonds' symptoms were, in fact, caused by overmedication.  (Tr. 26).  He reached this conclusion in the

absence of any evidence and despite the fact that Dr. Grater obviously did not feel she was overmedicated, since he increased her dose of Clonazepam in April, 2009, after the examination by Dr. Burke.

Lastly, the ALJ concluded that the fact that she once had a GAF of 62 was "a clear indication that her mental impairments are amenable to treatment." (Tr. 27). Actually, there is some confusion about the score of 62 in the records. The score of 62 was noted to be her GAF at discharge from St. Mary's Good Samaritan. Although she was discharged on November 12, 2008 (Tr. 298), the score was recorded in a note that was dated December 1, 2008. (Tr. 299). The December 1, 2008, note was signed by a social worker, but is it unclear on the record who assessed the GAF of 62. In any event, the fact that she had a GAF score of 62 on one occasion after almost two months of frequent treatment in a partial hospitalization program does not mean that Ms. Edmonds did not have the symptoms later documented by both Dr. Grater and Dr. Burke. "[S]ymptoms that 'wax and wane' are not inconsistent with a diagnosis of major, recurrent depression." *Larson v. Astrue*, 615 F.3d 744, 751 (7th Cir. 2010).

## Conclusion

The ALJ erred in his consideration of Dr. Tin's opinions as well as in his consideration of Dr. Grater's opinions. Without making any suggestion as to whether plaintiff is, in fact, disabled, or as to what the ALJ's decision should be on reconsideration, this Court concludes that this case must be remanded to the Commissioner for further proceedings. Remand of a social security case can be ordered pursuant to sentence four or sentence six of 42 U.S.C. § 405(g). A sentence four remand depends upon a finding of error, and is itself a final, appealable order. In contrast, a sentence six remand is for the purpose of receipt of new evidence, but does not

determine whether the Commissioner's decision as rendered was correct. A sentence six remand is not an appealable order. See, ***Shalala v. Schaefer***, 113 S. Ct. 2625, 2629 (1993); ***Perlman v. Swiss Bank Corporation Comprehensive Disability Protection Plan***, 195 F.3d 975, 978 (7th Cir. 1999).

Here, a sentence four remand is appropriate.

### Recommendation

This Court recommends that the Commissioner's final decision be **REVERSED and REMANDED** to the Commissioner for rehearing and reconsideration of the evidence, pursuant to sentence four of **42 U.S.C. §405(g).**

Objections to this Report and Recommendation must be filed on or before **October 22, 2012**.

  Submitted: October 4, 2012.


       s/ Clifford J. Proud
       **CLIFFORD J. PROUD**
       **UNITED STATES MAGISTRATE JUDGE**